# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 30, 2010

No. 09-30452

Lyle W. Cayce
Clerk

RITA JETER,

Plaintiff-Appellant,

v.

MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

Before GARZA and BENAVIDES, Circuit Judges, and LYNN[*], District Judge.
FORTUNATO P. BENAVIDES, Circuit Judge:

We are presented with the question of whether district courts may employ the lodestar method to determine whether an attorney fee constitutes a "windfall" under *Gisbrecht v. Barnhart*, 535 U.S. 789 (2002). Because we read *Gisbrecht* as merely forbidding *exclusive* reliance on the lodestar method to determine the reasonableness of a 42 U.S.C. § 406(b) attorney fee, we do not conclude that *Gisbrecht* precludes a court's consideration of the lodestar method altogether. And since the district court here did not rely exclusively on the lodestar method to evaluate the reasonableness of a contingency fee, we conclude

---

[*] District Judge of the Northern District of Texas, sitting by designation.

No. 09-30452

the district court did not abuse its discretion in finding the contingency fee unreasonable under § 406(b).  Accordingly, we AFFIRM the decision of the district court, and we write further only to clarify an area of the law that, following the Supreme Court's decision in *Gisbrecht*, has resulted in confusion and conflicting outcomes in the decisions of our lower courts.

## FACTS AND PROCEDURAL BACKGROUND

The named appellant in this appeal, Gary W. Jeter ("Jeter"), is a Social Security benefits claimant.  He is represented by his attorney, John G. Ratcliff ("Ratcliff"), who is the real party in interest for purposes of this appeal's pertinent analysis.[1]  On appeal, Ratcliff challenges the district court's denial of the contingency fee he made with Jeter.[2]

On August 12, 2002, Jeter filed an application for Title II disability insurance benefits and Title XVI supplemental security income, alleging an inability to work due to physical impairments resulting from a myocardial infarction.  On April 22, 2005, an administrative law judge issued a decision finding Jeter not disabled under the Act.  Jeter requested review before the Appeals Council, and on November 29, 2005, the Council denied his request.  As

---

[1] As the Supreme Court noted in *Gisbrecht*, although Jeter is named as the appellant, the real party in interest is his attorney Ratcliff, who "seek[s] to obtain higher fee awards under § 406(b)." *Gisbrecht*, 535 U.S. at 798 n.6.  The *Gisbrecht* Court also noted "that the Commissioner of Social Security here . . . has no direct financial stake in the answer to the § 406(b) question; instead, [h]e plays a part in the fee determination resembling that of a trustee for the claiman[t]." *Id.*

[2] Fees for representation of individuals claiming Social Security old-age, survivor, or disability benefits, both at the administrative level and in court, are governed by prescriptions Congress created in 1965. Social Security Amendments of 1965, 79 Stat. 403 (codified as amended at 42 U.S.C. § 406). The statute deals with the administrative and judicial review stages discretely: § 406(a) governs fees for representation in administrative proceedings; § 406(b) controls fees for representation in federal court. *See also* 20 CFR § 404.1728(a).

No. 09-30452

a result, Jeter had exhausted his administrative remedies and could then file an appeal of the Administration's denial of his claim to the United States District Court, for the Western District of Louisiana.

Jeter sought out the services of Ratcliff. Ratcliff agreed to represent Jeter in his appeal of the Administration's denial of his claim for benefits, and on January 12, 2006, the two entered into an agreement (what is commonly known as a "contingency fee") stipulating that Ratcliff would provide Jeter with representation to appeal the denial of his claim in federal court, in exchange for twenty-five percent of Jeter's unpaid past benefits– in the event that Ratcliff's representation proved to be successful. On that very same day, Ratcliff filed Jeter's appeal in the district court.

The case proceeded and six months later, on July 31, 2006, Ratcliff filed a brief arguing that the Administration's failure to find Jeter disabled violated the Act. On October 4, 2006, the Administration filed a motion requesting remand. The matter was referred to a magistrate judge, and the magistrate judge recommended remand. Soon thereafter, the district court adopted the magistrate judge's report and recommendation in its entirety, and entered judgment remanding the case. After further proceedings before the Administration, including a hearing and a supplemental hearing, a second administrative law judge determined that Jeter had been disabled since March 20, 2002. In a notice of award dated May 4, 2008, the Administration stated that Jeter's "past due benefits are $89,289.00 for September 2002 through March 2008."[3] As highlighted above, Jeter and Ratcliff's contingency fee agreement set

---

[3] For purposes of § 406(b), a successful decision on remand is considered a favorable decision before the district court. No party disputes that Ratcliff is entitled to some fee for his success in representing Jeter. The question is merely *how much*, and whether the district

No. 09-30452

Ratcliff's fee at twenty-five percent. Twenty-five percent of $89,289.00 is $22,322.25.

Ratcliff then collected $5,300.00, the maximum fee permitted for his work at the administrative level, leaving a balance of $17,022.25 available for attorney's fees under § 406(b). Ratcliff returned to the federal district court and, pursuant to § 406(b), requested the $17,022.25 in fees for the work he performed in the district court. At the same time, Ratcliff noted that he intended to refund Jeter the $2,827.50 in fees he had previously received under the Equal Access to Justice Act (EAJA) , recognizing that "[f]ee awards may be made under both [EAJA and § 406(b)], but the claimant's attorney must refund to the claimant the amount of the smaller fee." *Gisbrecht*, 535 U.S. at 796.[4] As a result, Ratcliff's request that the contingency fee be formally recognized resulted in a request for $14,734.74 in attorney's fees. On July 1, 2008, the Administration filed its opposition to Ratcliff's § 406(b) motion, arguing that Ratcliff's requested fee was not reasonable because it would result in a "windfall."

The case was once again referred to a magistrate judge, and the magistrate judge issued a report and recommendation on December 29, 2008. The magistrate judge recommended granting Ratcliff's request for payment pursuant to his and Jeter's contingency fee but reducing the total amount

---

court erred when it failed to award the actual contingency fee award.

[4] "Congress harmonized fees payable by the Government under EAJA with fees payable under § 406(b) out of the claimant's past-due Social Security benefits in this manner: Fee awards may be made under both prescriptions, but the claimant's attorney must refun[d] to the claimant the amount of the smaller fee." *Gisbrecht*, 535 U.S. at 796 (internal quotation marks omitted).

Ratcliff would be awarded to $3,993.75.[5] In her report and recommendation, the magistrate judge began by noting that "courts have struggled significantly in applying *Gisbrecht*." Specifically, she noted that the "question for this court to answer is whether the Administration is correct that the fee represents a windfall."

Thus, in undertaking a § 406(b) "reasonableness" analysis, the court considered several factors including: (1) Ratcliff's degree of expertise in Social Security cases; (2) the adequacy of Ratcliff's representation of Jeter; (3) the amount Jeter ultimately recovered; (4) the fact that Ratcliff sought twenty-five percent of Jeter's recovered amount; and (5) Ratcliff's risk of loss. The court also considered the hourly rate Ratcliff would receive as a result of the contingency fee–by dividing the fee by the number of hours Ratcliff worked–and found that if the court deemed the whole fee to be reasonable, Ratcliff would be paid at a rate of $846.88 per hour for his services. In considering all of the aforementioned factors combined, the magistrate judge recommended that the district court find that Ratcliff's requested fee would result in an unreasonable windfall under *Gisbrecht*.

Since she found the contingency fee unreasonable, the magistrate judge recommended that instead of the requested $14,734.74, the district court award $3,993.75, reasoning that "[t]his will result in . . . an amount the court considers reasonable and appropriate under the circumstances before it." On April 3, 2009, the district court fully adopted the magistrate judge's report and

---

[5] The magistrate judge calculated the award to be $6,281.25, but after refunding Jeter the $2,287.50 previously awarded to Ratcliff as his EAJA fee, Ratcliff would be awarded only $3,993.75 for his services performed on Jeter's behalf in the district court.

No. 09-30452

recommendation, finding the requested contingency fee unreasonable and awarding only $3,993.75.

This appeal timely followed.  On appeal, Ratcliff asserts that the district court erred when it found his § 406(b) contingency fee would constitute a windfall under *Gisbrecht*.  In particular, Ratcliff argues that the district court's reliance on the lodestar method in making its fee determination violates the Supreme Court's decision in *Gisbrecht*.  As we will explain in greater detail to follow, we find that the district court did not rely exclusively on a lodestar calculation to find Ratcliff's requested fee unreasonable, and consequently, we cannot conclude that the district court's fee award violates *Gisbrecht*.  We write further, however, in order to provide our lower courts better guidance in navigating the circuitous contours of *Gisbrecht*'s "windfall" jurisprudence.

## STANDARD OF REVIEW

A district court's assessment of whether a contingency fee is reasonable under 42 U.S.C. § 406(b) "qualif[ies] for [this Court's] highly respectful review." *Gisbrecht*, 535 U.S. at 808.  That is, "[a]n award of attorney's fees out of past-due benefits is discretionary, and we will not reverse a district court's denial of attorney's fees under § 406(b) absent an abuse of discretion." *Pierce v. Barnhart*, 440 F.3d 657, 663 (5th Cir. 2006).

"A district court abuses its discretion when it bases its decision on an erroneous legal conclusion or on a clearly erroneous finding of fact." *James v. Cain*, 56 F.3d 662, 665 (5th Cir. 1995); *see also Squires-Allman v. Callahan*, 117 F.3d 918, 920 (5th Cir. 1997) ("Underlying findings of fact are reviewed for clear error.  Underlying conclusions of law, however, are reviewed *de novo*.") (internal citations omitted).  Accordingly, "'it is not inconsistent with the discretion

6

No. 09-30452

standard for an appellate court to decline to honor a purported exercise of discretion which was infected by an error of law.'" *Rice v. Astrue*, 609 F.3d 831, 836 n.22 (5th Cir. 2010) (quoting *Abrams v. Interco, Inc.*, 719 F.2d 23, 28 (2d Cir. 1983)) (internal citations omitted).

## ANALYSIS

As the magistrate judge aptly noted in her report and recommendation, our "courts have struggled significantly in applying *Gisbrecht*." This is because the *Gisbrecht* Court began by explicitly rejecting the application of the "lodestar method to calculate fees under § 406(b),"[6] *Gisbrecht*, 535 U.S. at 798, and then concluded by stating that "[i]f the benefits [resulting from the contingency fee] are large in comparison to the amount of time counsel spent on the case, a downward adjustment is similarly in order [to] . . . disallow *windfalls* for lawyers." *Id.* at 808 (internal citations and quotation marks omitted) (emphasis added). We are not surprised that many of our lower courts have interpreted this as a contradictory mandate: lower courts must not employ the lodestar method to determine whether the hourly rate is excessively high and the fee thus unreasonable, but if the hourly rate is excessively high, then lower courts may declare the fee to be a *windfall* and, ultimately, unreasonable.[7]

We find, however, that it is possible to construe *Gisbrecht* such that its prohibition against lone reliance on the lodestar method still permits a court to

---

[6] *See also, Gisbrecht*, 535 U.S. at 793 (proscribing lower courts' reliance on "lodestar calculations . . . [since they] rejec[t] the primacy of lawful attorney-client fee agreements.").

[7] *See id.* at 809 (Scalia, J., dissenting) ("I do not know what the judges of our district courts and courts of appeals are to make of today's opinion . . . . While today's opinion gets this case out of our 'in' box, it does nothing whatever to subject these fees to anything approximating a uniform rule of law.").

include a lodestar calculation in its consideration of the fee– specifically, in instances where the court simultaneously relies on additional factors to support its determination that the contingency fee constitutes an unearned advantage to the attorney–such that the fee award may be considered a windfall.

A brief examination of the rationale behind the Supreme Court's decision in *Gisbrecht* provides support for our understanding and interpretation of *Gisbrecht*'s holding–and ultimately, demonstrates why the district court did not abuse its discretion in this particular instance.

## I.    THE SUPREME COURT'S DECISION IN *GISBRECHT*

First, it is important to note that the Supreme Court's decision in *Gisbrecht* came about in response to a circuit split. *See Gisbrecht*, 535 U.S. at 799 ("We granted certiorari in view of the division among the Circuits on the appropriate method of calculating fees under § 406(b).") (internal citation omitted). Prior to *Gisbrecht*, the Second, Sixth, and Seventh Circuits did not begin a § 406(b) reasonableness determination with a lodestar calculation, but instead all gave primacy "effect to attorney-client contingent-fee agreement[s.]" *See id.* (citing *Wells v. Sullivan*, 907 F.2d 367 (2d Cir. 1990); *Rodriquez v. Bowen*, 865 F.2d 739 (6th Cir. 1989) (en banc); and *McGuire v. Sullivan*, 873 F.2d 974 (7th Cir. 1989)). The Third, Fourth, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits, however, did not. As the Supreme Court noted, in order to determine whether a § 406(b) contingency fee was reasonable, these Circuit Courts looked first to the lodestar method to determine whether the resulting hourly fee would be higher than the attorney's normal hourly rate. *See id.* (citing *Coup v. Heckler*, 834 F.2d 313 (3d. Cir. 1987); *Craig v. Secretary, Dept. of Health and Human Servs.*, 864 F.2d 324 (4th Cir. 1989); *Brown v. Sullivan*, 917 F.2d 189 (5th Cir.

1990); *Cotter v. Bowen*, 879 F.2d 359 (8th Cir. 1989); *Gisbrecht v. Apfel*, 238 F.3d 1196 (9th Cir. 2000); *Hubbard v. Shalala*, 12 F.3d 946 (10th Cir. 1993); *Kay v. Apfel*, 176 F.3d 1322 (11th Cir. 1999)).

In rejecting these courts' cardinal reliance on the lodestar method to determine a "reasonable" fee under § 406(b), we find it important to note in particular that the *Gisbrecht* Court abrogated this Court's decision in *Brown v. Sullivan*, 917 F.2d 189 (5th Cir. 1990). In *Brown*, this Court had held that although "due consideration [must] be given to the contingency fee agreement . . . [t]he *starting point* . . . is the number of attorney hours reasonably expended on litigation multiplied by a reasonable hourly rate." *Id*. at 192 (internal quotation marks omitted). That is, this Court recognized a lodestar calculation as the method lower courts should "us[e] as a first approximation of the reasonable hourly rate" when determining a reasonable fee under § 406(b). *Id*.

In *Gisbrecht*, the Supreme Court explicitly rejected *Brown*'s primary reliance on the lodestar method as the "starting point" in determining a fee's reasonableness pursuant to § 406(b). Although the Supreme Court noted that "the 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence[,]" *Gisbrecht*, 535 U.S. at 801 (internal quotation marks and brackets omitted), the *Gisbrecht* Court distinguished § 406(b) fee awards on the basis that 42 U.S.C. § 406(b) is *not* a fee-shifting statute. As a result, the *Gisbrecht* Court reasoned that the lodestar method does not serve the same purpose as when applied to the fee-shifting statutes from which it actually originated. *Id*. at 802. That is, "the lodestar method today holds sway in federal-court adjudication of disputes over the amount of fees properly shifted to the loser in the litigation." *Id*. Section 406(b), however, does not shift fees to

No. 09-30452

the loser (in this case, the Administration), but rather, § 406(b) shifts fees to the winner, the claimant (in this case Jeter). *Id.* ("Fees shifted to the losing party, however, are not at issue here.").[8]

Furthermore, in contrast to the fee-shifting statutes that created the lodestar method, § 406(b) constitutes "the exclusive regime for obtaining fees for successful representation of Social Security benefits claimants." *Id.* at 795-96. This distinction is significant because plaintiffs whose actions are covered by fee-shifting statutes can offer to pay their attorneys money above and beyond what they might recover under the applicable fee-shifting statute, if and when they are successful. *See id.* at 801-02. This gives the fee-shifting plaintiffs the ability to expend their own resources–if they wish to–in order to obtain better counsel. A Social Security claimant, however, cannot pay his counsel more than twenty-five percent of the unpaid benefits he receives if his attorney is successful. In fact, if an attorney accepts or attempts to collect anything beyond twenty-five percent of the claimant's unpaid past benefits, the attorney subjects himself to criminal prosecution. *Id.* at 796 ("Collecting or even demanding from the client anything more than the authorized allocation of past-due benefits is a criminal offense.") (citing 42 U.S.C. §§ 406(a)(5), (b)(2); 20 CFR §§ 404.1740-1799). As a result, "[t]he lodestar method under-compensates attorneys for the risk they assume in representing SSDI claimants and ordinarily produces remarkably smaller fees than would be produced by starting with the contingent-fee agreement." *Crawford v. Astrue*, 586 F.3d 1142, 1149 (9th Cir. 2009) (en banc).

---

[8] *See also*, *Crawford v. Astrue*, 586 F.3d 1142, 1148 (9th Cir. 2009) (en banc) ("The Court explained that the lodestar method was developed to implement fee-shifting statutes, which assess fees against the losing party and which do not prevent the attorney from seeking additional fees from the client.") (citing *Gisbrecht*, 535 U.S. at 802, 806).

No. 09-30452

With this in mind, Congress wrote § 406(b)(1)(A) in 1965 to read as follows:

> Whenever a court renders a judgment favorable to a claimant under this subchapter who was represented before the court by an attorney, the court may determine and allow as part of its judgment a reasonable fee for such representation, not in excess of 25 percent of the total of the past-due benefits to which the claimant is entitled by reason of such judgment. . . .

Consequently, the *Gisbrecht* Court reasoned that by limiting contingency fees to no more than twenty-five percent, "Congress thus sought to protect claimants against 'inordinately large fees' and also to ensure that attorneys representing successful claimants would not risk 'nonpayment of [appropriate] fees.'" *Gisbrecht*, 535 U.S. at 805 (quoting SSA Report 66). Given the aforementioned distinctions between fee-shifting statutes and § 406(b), the *Gisbrecht* Court reasoned that it was "unlikely that Congress, legislating in 1965, and providing for a contingent fee tied to a 25 percent of past-due benefits boundary, intended to install a lodestar method courts did not develop until some years later." *Id.* at 806.

Thus, the aforementioned discussion reveals that the *Gisbrecht* Court proscribes exclusive, primary reliance on the lodestar method to determine the reasonableness of a § 406(b) fee award. It is clear that the *Gisbrecht* Court first instructed our lower courts to give the contingency fee agreement "primacy"–recognizing that this would in some instances result in an excessively high fee award to an individual attorney–and justifying this potential for excessively high fees on the basis that § 406(b) is not a fee-shifting statute. Although in some instances a twenty-five percent contingency fee may result in a seemingly large fee, a particular claimant's attorney often is not compensated

11

No. 09-30452

at all for Social Security work in federal court.[9]  Thus, the *Gisbrecht* Court recognized that Congress wrote § 406(b) to "ensure that attorneys representing successful claimants would not risk 'nonpayment of [appropriate] fees.'" *Gisbrecht*, 535 U.S. at 805 (quoting SSA Report 66).  Therefore, the best reading of *Gisbrecht* highlights the most significant distinction between the lodestar method's role in fee-shifting statutes and its inapposite role in § 406(b): because § 406(b) is not a fee-shifting statute, the § 406(b) fee award constitutes the *sole* means by which claimants can compensate–and thereby secure their access to–competent counsel.

With this understanding of *Gisbrecht* in mind, the closing paragraph of *Gisbrecht* may seem a mystery.  Although the *Gisbrecht* Court went to great lengths to explain its denouncement of the lodestar method for § 406(b) reasonableness determinations, the Court concluded by instructing lower courts that, "[i]f the benefits are large in comparison to the amount of time counsel spent on the case, a downward adjustment is . . . in order [to] . . . disallow *windfalls* for lawyers."  *Id*. at 808 (internal citations and quotation marks omitted) (emphasis added).  And so the question post-*Gisbrecht* is really the following: if lower courts are not to resort first to the lodestar method when determining whether a fee is reasonable under § 406(b), may a lower court give the lodestar method *any* consideration in its determination of whether a contingency fee constitutes a "windfall"?

---

[9]  "Counsel always are accepting some risk in taking social security cases under contingency fee contracts because, statistically, roughly fifty percent will lose at the district court level." *Mentzell v. Astrue*, 623 F. Supp. 2d 1337, 1341-42 (M.D. Fla. 2008).  We note that before this Court, the success rate is significantly lower than the rate of success before district courts.

No. 09-30452

## II.    WHETHER RATCLIFF'S FEE CONSTITUTES A WINDFALL

On appeal, Ratcliff asserts that because the district court determined the reasonableness of his § 406(b) fee by considering the resulting hourly rate he would receive for his services, the district court abused its discretion and violated *Gisbrecht*'s edict against relying on the lodestar method. Thus, the crux of Ratcliff's argument is that *Gisbrecht* forbids *any* consideration of the lodestar method in § 406(b) fee determinations. Our reading of *Gisbrecht*, however, does not abide that position.

Ratcliff's proffered interpretation of *Gisbrecht* would render the concluding paragraph of *Gisbrecht* meaningless (where the Court held that "a downward adjustment [may be] . . . in order [to] . . . disallow for windfalls" *id.* at 808), just as permitting courts to rely exclusively on the lodestar method to declare a fee unreasonable would render the entirety of *Gisbrecht*'s decision meaningless. Instead, we conclude that *Gisbrecht*'s concluding reference to downward adjustments for windfalls must be read in accordance with *Gisbrecht*'s instruction that courts are not to rely exclusively on the lodestar method. Adopting Ratcliff's interpretation would require our judges to blind themselves to a factor the Supreme Court has clearly deemed worthy of consideration, while allowing exclusive reliance on the lodestar method to find fees unreasonable would have the effect of converting every contingency fee that results in an amount higher than the lodestar into a windfall. Thus, neither of these two interpretations can be squared with the entirety of the Supreme Court's decision.

Although the Supreme Court did not set out a clear list of circumstances in which a court may find that a contingency fee results in an unreasonable windfall, we conclude that courts may consider the lodestar in their analyses so

13

No. 09-30452

long as the court can articulate additional factors demonstrating that the excessively high fee would result in an unearned advantage. In other words, the *Gisbrecht* Court's reference to windfall leaves room for consideration of an effective hourly fee rate, but only so long as this mathematical calculation is accompanied by consideration of whether an attorney's success is attributable to his own work or instead to some unearned advantage for which it would not be reasonable to compensate him.

Any other reading would give attorneys a perverse incentive to delay proceedings or expend unnecessary hours in an effort to prolong successful litigation–all to ensure that their § 406(b) fee would not be reduced based on its appearing excessively high in comparison to the number of hours they expended.[10] Likewise, we do not read *Gisbrecht*'s "windfall" as support for the proposition that experienced, competent counsel should be punished for accomplishing an arduous task in a shorter span of time than less-experienced, less-aggressive counsel. Accordingly, we interpret *Gisbrecht*'s prohibition on the lodestar method as an affirmation that if a claimant's success on appeal can be attributed to his attorney's endeavors before the district court, then that attorney should reap the benefit of his work–even if he managed to accomplish a great deal in a small window of time. In this way, *Gisbrecht*'s "windfall" does

---

[10] Apart from considering whether a fee would result in a windfall, the *Gisbrecht* Court also recognized that where a district court finds that an attorney unnecessarily delayed the proceedings in order to receive a large fee award, that is reason alone to reduce the fee award. *Gisbrecht*, 535 U.S. at 808 ("If the attorney is responsible for delay, for example, a reduction is in order so that the attorney will not profit from the accumulation of benefits during the pendency of the case in court."). This sort of reduction, however, is limited to instances where the attorney himself unnecessarily delayed the proceedings. Nothing in *Gisbrecht* supports reducing the attorney's fee merely because the Administration or the court acted to delay or extend the timeline of the proceedings.

14

not preclude attorneys from recovering what may mathematically seem like a high fee award if the attorney's success on appeal is of his own making.

Thus, our district courts may consider the lodestar method in determining the reasonableness of a § 406(b) fee, but the lodestar calculation alone cannot constitute *the* basis for an "unreasonable" finding. Looking to the present case, we find that the district court did not rely exclusively on the lodestar method to find Ratcliff's requested fee unreasonable. Instead, the district court considered the resulting hourly fee rate in combination with a list of additional factors the district court found combined to demonstrate that the fee constituted an unearned windfall under *Gisbrecht*, and consequently we cannot say that the district court abused its discretion in declaring the fee unreasonable pursuant to § 406(b).[11] Again, in finding that the district court did not abuse its discretion, we read *Gisbrecht* as commanding that in order for district courts to rely on the lodestar method to find a particular fee constitutes a windfall, the district court must also articulate the factors that demonstrate to the court that the fee is unearned. Specifically, the district court must discuss the factors that demonstrate that the success on appeal is not of the attorney's making, but

---

[11] Ratcliff also argues that the district court erred when it reduced his fee in accordance with the court's determination that his hourly rate was $125 per hour. Given that this Court reviews "[u]nderlying findings of fact . . . for clear error," we do not find that the district court abused its discretion and committed clear error in adopting this specific factual conclusion. *Squires-Allman*, 117 F.3d at 920. First, Ratcliff states in his brief that "[w]hen he last charged by the hour in cases unrelated to Social Security disability benefits, he charged $180.00 per hour." Although the magistrate judge used $125.00 as the "hourly rate"–the magistrate judge multiplied that rate by 2.5 to get to $312.50 (which she then multiplied by the number of hours she reasoned Ratcliff reasonably worked). Since the actual number the magistrate judge used ($312.50) is considerably higher than the hourly rate Ratcliff listed as his own ($180.00), we would be hard pressed to conclude that the district court actually committed clear error in its factual findings that Ratcliff's hourly rate was $125.00.

No. 09-30452

rather, is attributable to some other source for which it would be unreasonable to compensate the attorney. *See Gisbrecht*, 535 U.S. at 808 (the reasonableness § 406(b) inquiry requires courts to assess whether the contingency fee reflects "the character of the representation and the results the representative achieved.").

We hesitate, however, in this particular instance to prescribe an exhaustive list of the precise factors our lower courts must consider in order to determine whether a particular fee is unearned such that it may be considered a windfall. Because district courts are in a better position to determine what factors are relevant in considering whether the success of a claimant's claim before their court can be attributed to the attorney's work–or whether the success is unearned on the part of the attorney–we will refrain at this time forcing our lower courts into applying an arbitrary, formulaic set of factors of our own making.[12] We do note, however, that in the absence of more specific guidance from above, lower courts have considered a myriad of factors that may demonstrate to the court whether the fee is an unearned windfall. For instance, in *Brannen v. Barnhart*, one of our lower courts explained that:

> [t]o guard against windfalls, some courts consider additional factors not explicitly proffered in *Gisbrecht*. These include risk of loss in the representation, experience of the attorney, percentage of the past-due benefits the fee constitutes, value of the case to a claimant, degree of difficulty, and whether the client consents to the requested fee. *See, e.g.*, *Hearn v. Barnhart*, 262 F.Supp.2d 1033, 1036-38

---

[12] If, later on down the line, it becomes clear to this Court that a list of factors would be instructive to our lower courts and lead to greater uniformity, we will certainly revisit the possibility of making such a list. At this time, however, there is no reason to assume that our lower courts need this Court to tell them all of the factors they can and cannot consider in order to decide whether an attorney's success on a particular case was unearned.

16

No. 09-30452

(N.D.Cal., Apr. 30, 2003) (considering risk of loss, experience of counsel, percentage of funds the fee consumes, value of the case to the plaintiff, and client's consent to fee requested); *Coppett v. Barnhart*, 242 F.Supp.2d 1380, 1393-85) (S.D. Ga., Sep. 11 2002) (considering risk of loss, difficulty of the case, and skill and experience of attorney.).[13]

Civ. A. No. 99-325, 2004 WL 1737443, at *5 (E.D. Tex., July 22, 2004).

While we are not limiting courts' consideration of what constitutes a windfall to some exhaustive list, we are instructing our courts that *Gisbrecht*'s windfall is not a simple reiteration of the lodestar method. Likewise, the Supreme Court's decision in *Gisbrecht* does not altogether preclude a district court's consideration of the lodestar method in a § 406(b) fee determination. Instead, *Gisbrecht* commands that where lower courts look to the lodestar method to evaluate the ratio of fee earned to number of hours expended, they cannot find that a particular fee award would result in a windfall unless the court can articulate additional, specific factors to demonstrate that the resulting high fee was unearned by the attorney—and thus not attributable to the attorney's representation of the client before the court.

The *Gisbrecht* Court certainly did not expect our district judges to turn a blind eye to hourly fee rates that are excessively high for the services provided

---

[13] If a district court considers whether the degree of risk undertaken by an attorney supports a fee reduction (*i.e.*, whether the risk of loss was so low that the claimant's success was not particular to the attorney's efforts), common sense dictates that the court's analysis begin with the risk involved at the time the claimant and the attorney entered into the contingency fee agreement. *Cf. Gisbrecht*, 535 U.S. at 810 (Scalia, J., dissenting) ("I think it obvious that the reasonableness of a contingent-fee arrangement has to be determined by viewing the matter *ex ante*, before the outcome of the lawsuit and the hours of work expended on the outcome are definitively known."). Although initial risk is an important factor, it will not always conclude the court's analysis. A case that appears risky at first may become straightforward through no effort of the claimant's attorney. A district court would be able to consider such extrinsic events in determining whether a fee is an unearned windfall.

No. 09-30452

in their courts. Rather, the *Gisbrecht* Court made it clear that as a result of the legislative history behind § 406(b)–as well as the difficult nature of Social Security appeals and their low rates of success in general–an excessively high hourly rate alone does not render an otherwise reasonable fee unreasonable. *Gisbrecht* commands no more and no less.

## CONCLUSION

For the aforementioned reasons, we AFFIRM the judgment of the district court.